**In re IBP CONFIDENTIAL BUSINESS DOCUMENTS LITIGATION.**

**Hughes A. BAGLEY, Appellee,**

v.

**IOWA BEEF PROCESSORS, INC., Appellant.**

No. 83–1894.

United States Court of Appeals, Eighth Circuit.

Submitted April 30, 1985.

Decided July 24, 1986.

Rehearing En Banc Denied Sept. 11, 1986.

Don H. Reuben, Chicago, Ill., for appellant.

William J. Rawlings, Sioux City, Iowa, for appellee.

Before LAY, Chief Judge, and HEANEY, BRIGHT,* ROSS, McMILLIAN, ARNOLD, John R. GIBSON, FAGG, and BOWMAN, Circuit Judges, En Banc.

FAGG, Circuit Judge.

Iowa Beef Processors, Inc. (IBP) appeals from the judgment of the district court awarding Hughes A. Bagley, a former IBP employee, $7 million in compensatory and punitive damages as well as $2.33 million in prejudgment interest. That judgment was entered on three distinct claims: (1) libel; (2) tortious interference with present employment; and (3) tortious interference with future employment opportunities.

IBP's challenge to the district court's judgment has previously been considered by a panel of this court. *Bagley v. Iowa Beef Processors, Inc.*, 755 F.2d 1300 (8th Cir.1985). Given the important issues raised by this case, however, IBP's appeal has now been considered by the court en banc. After carefully considering each of the issues raised by IBP, we affirm in part, reverse in part, and remand Bagley's libel claim to the district court for a new trial.

## I. Background

Late in 1977, the Subcommittee on General Small Business Problems of the House of Representatives Committee for Small Business (the Subcommittee) initiated an investigation into various aspects of the meat industry. The Subcommittee's goal in undertaking the investigation was essentially two-fold. First, the Subcommittee hoped to identify business practices employed in the meat industry that affect adversely the competitive position of small meatpackers. Second, and more important, the Subcommittee hoped to determine whether existing laws were sufficient to ensure the continued presence of healthy competition in the meat industry.

During its investigation, the Subcommittee closely examined the activities of various meatpackers. Over the course of its investigation, however, the Subcommittee's interest came to focus most sharply on the activities of one particular meatpacker. That meatpacker was IBP.

The Subcommittee's interest in IBP was hardly surprising. Over the course of a relatively few years, IBP had grown into the largest processor of beef in the United States, and by the very nature of its size, IBP was viewed by many to be in a position to influence significantly the overall structure and development of the meat industry. Further, and equally as significant to the Subcommittee were various IBP business activities that in the past had attracted substantial public attention. These activities, while often innovative, had at times also been highly controversial. In fact, IBP on a number of occasions had found itself the target of antitrust litigation, adverse publicity, and violent union confrontation.

In the course of its activities, the Subcommittee conducted a number of public hearings. During these hearings, a variety of witnesses appeared and testified concerning IBP and its impact on the meat industry. Several of these witnesses specifically accused IBP of engaging in anticompetitive practices.

As part of its overall investigation, the Subcommittee, in November of 1978, subsumed senior judge status on June 1, 1985.

* The HONORABLE MYRON H. BRIGHT assumed senior judge status on June 1, 1985.

poenaed a large number of documents then under protective order in the United States District Court for the Southern District of Iowa. At that time, the ownership of these documents was at the center of a lawsuit filed by IBP against Hughes A. Bagley, a former IBP executive vice president. *See IBP, Inc. v. Bagley*, 754 F.2d 787 (8th Cir. 1985).

Bagley, an individual with thirty years experience in the meat industry, had been an executive with IBP from December of 1971 until July of 1975. In July of 1975, Bagley was abruptly fired by IBP and was ordered to leave immediately. Bagley left immediately, but in so doing took with him from his personal files the documents that three years later became the focus of IBP's lawsuit against him. These documents, numbering many thousands of pages, included IBP weekly profit and loss statements, IBP monthly production and sales reports, confidential legal memoranda, and memoranda outlining IBP's goals, marketing strategies, and pricing formulas.

The events leading to IBP's lawsuit against Bagley took place in late 1977 and early 1978. During that period, Bagley met privately with and in several cases provided IBP documents to a number of individuals, including several attorneys who at that time were involved in (or hoped to become involved in) extensive antitrust litigation against IBP and several other meatpackers. Shortly after these meetings and during the course of the antitrust litigation, IBP learned of Bagley's activities and of his possession of internal IBP documents. *See Meat Price Investigators Association v. Iowa Beef Processors, Inc.*, 448 F.Supp. 1, 2–4 (S.D.Iowa 1977), *aff'd*, 572 F.2d 163, 164–65 (8th Cir.1978).

At that point, IBP instituted its action against Bagley. In that action, IBP sought to recover possession of the documents. IBP also accused Bagley of violating a termination agreement that had been entered into by Bagley with IBP following Bagley's departure from IBP.

As part of IBP's lawsuit, the district court placed a protective order on the IBP documents in Bagley's possession. That order was in place when the Subcommittee's subpoena duces tecum was issued to Bagley. On Bagley's motion, the district court partially lifted the protective order to enable Bagley to comply with the Subcommittee subpoena. *See Iowa Beef Processors, Inc. v. Bagley*, 601 F.2d 949 (8th Cir.), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1997, 60 L.Ed.2d 376 (1979).

After examining the subpoenaed documents, the Subcommittee, in January of 1979, subpoenaed Bagley personally. Under subpoena, Bagley met with Subcommittee investigators in January and answered questions concerning the subpoenaed documents. Bagley was also subpoenaed to testify before the Subcommittee, and in July of 1979, Bagley again met with Subcommittee investigators to answer additional questions concerning the IBP documents.

Prior to the hearings at which Bagley was scheduled to testify, Subcommittee Chairman Neal Smith of Iowa sent a letter on behalf of the Subcommittee to IBP President Robert Peterson. In that letter, Congressman Smith invited IBP to send a representative to Washington to testify before the Subcommittee during its July hearings.

Congressman Smith stated that any representative sent by IBP would appear "under oath" and would have an opportunity to present a "written statement" as well as make an "oral presentation of reasonable length." Following that presentation, IBP's representative would be "questioned" by the members of the Subcommittee. *See Small Business Problems in the Marketing of Meat and Other Commodities: Hearings Before the Subcommittee on SBA and SBIC Authority and Small Business Problems of the House Committee on Small Business*, 96th Cong., 1st Sess. 3 (1979).

In his letter, Congressman Smith also specifically identified those topics of central interest to the Subcommittee. The topics mentioned by Congressman Smith included

matters raised by the so-called "Bagley documents," the reported expansion efforts of IBP into the western portion of the United States, matters involving the labor and transportation practices and relationships of IBP, activities of IBP in the areas of meat pricing and cattle futures, the procurement practices of IBP in obtaining live cattle for slaughter and other possible topics.

*Id.* In essence, these topics touched upon the various concerns regarding IBP's activities that had been raised during the course of the Subcommittee's investigation.

In closing the letter, Congressman Smith emphasized the seriousness of the Subcommittee's investigation, stating:

> As you know, a great deal of testimony received by the Subcommittee has been in regard to Iowa Beef Processors. If new legislation or rules are enacted to limit dominance by any companies in the meat industry or to ensure that enough competition remains in the industry to prevent undesirable economic consequences, it is clear that Iowa Beef Processors will be one of the companies most affected.

*Id.*

The Subcommittee reconvened on July 23, 1979. During two days of hearings, Bagley was the only witness to appear and testify. In his two days of testimony, Bagley (under questioning) addressed a number of topics related to various IBP business practices. These topics included IBP's company goals, IBP's pricing practices, and IBP's dealings with other meatpackers.

One topic discussed by Bagley during his testimony is particularly relevant to the present dispute. That topic concerned an IBP quantity discount program offered on its Cattle-Pak boxed beef product. In general terms, boxed beef is a method of processing and marketing beef in which IBP, rather than the retailer, fully processes the beef carcass into primal and subprimal cuts. These cuts are then individually packed in vacuum-sealed plastic bags and shipped individually or in units (as is the case with Cattle-Pak) to retailers. Not

only is this an efficient method of processing beef, but because much of the bone and fat that would otherwise be shipped to retailers is removed by IBP during processing, shipping costs are substantially reduced.

Bagley testified that in its inception, the Cattle-Pak discount program, which, according to Bagley, was offered only to IBP's biggest customers, was intended to reflect and pass on a portion of the cost savings realized by IBP from high volume sales. Bagley stated, however, that the corporation failed to justify or document the supposed cost reductions prior to offering the program. Bagley testified further that IBP continued the discount program even after serious questions concerning its ability to justify the program based on cost reductions had been raised. According to Bagley, while questions about the program culminated in mid-1973 with a recommendation that the program be discontinued, some type of discount program was still in effect at IBP in June of 1975.

While invited to do so, IBP declined to send a representative to the Subcommittee's July 1979 hearings. Rather, on August 1, 1979, IBP, through its president, Robert Peterson, responded to Congressman Smith's invitation by letter (the Peterson letter). In that letter, IBP explained its reasons for not attending the hearing, essentially taking the position that Congressman Smith was prejudiced against it and would prevent IBP from receiving a fair hearing before the Subcommittee. *See* Letter from IBP to Congressman Smith 1–5 (August 1, 1979). IBP also offered a detailed response challenging the testimony of each of the witnesses who had appeared before the Subcommittee and testified about IBP and its business practices.

Approximately one-half of the Peterson letter addressed statements made by Bagley during his two days of testimony. IBP answered fully each of the issues covered by Bagley, characterized by IBP as a disgruntled ex-employee who, upon leaving IBP, "stole 7 boxes of IBP documents,

many of a confidential business and legal nature." *Id.* at 15.

Of particular significance here is IBP's explanation of the quantity discount program testified extensively to by Bagley. In its response to Bagley's description of that program, IBP sharply attacked Bagley's testimony, asserting that "Bagley's version of IBP's quantity discount program is absolutely false, and * * * constitutes perjury * * *." *Id.* at 24.

Explaining its version of the program, IBP conceded that for a short period of time a quantity discount had been offered to all IBP customers purchasing a certain quantity of Cattle-Pak cattle. IBP asserted, however, that on advice of counsel the discount program was discontinued in late 1973 pending a long-range study intended to identify and quantify those savings believed by IBP to be inherent in volume purchases. According to IBP, Bagley was intimately involved in the termination of the discount program and knew the program had been discontinued in 1973. *See id.* at 24–27.

With respect to Bagley's contention that the quantity discount program was still in effect in 1975, IBP did acknowledge that for a short period in 1975 a price reduction of eight dollars per head had been offered to all IBP Cattle-Pak customers. IBP contended, however, that this rebate constituted a special one-time price reduction in no way related to IBP's long discontinued quantity discount program. According to IBP, Bagley's suggestion to the contrary was "clear perjury." *Id.* at 27.

IBP sent a copy of the Peterson letter to each member of the Subcommittee and expressly requested that the Subcommittee make the letter a part of its formal public record. The Subcommittee refused IBP's request and did not make the Peterson letter a part of the Subcommittee's public record. However, by mid-September portions of the letter had been leaked to the press and had been widely reported in the media.

Despite the Subcommittee's refusal to make the Peterson letter a part of its formal record and despite repeated requests, IBP for a time refused to make copies of the Peterson letter available to interested parties. Rather, IBP referred all inquiries to the Subcommittee. In October, however, after the letter had already received extensive media coverage, IBP made the letter available to those in the media and in the meat industry who expressed an interest in it. Further, late in 1979, as part of a bound volume containing several other documents, IBP sent the Peterson letter to a number of interested parties, including members of the Livestock and Grain Subcommittee, IBP's directors, officers, and plant managers, certain members of various agricultural associations, professors at several academic institutions, and approximately fifty members of the media.

Not surprisingly, given the highly antagonistic relationship already existing between Bagley and IBP, Bagley, in the wake of the Peterson letter as well as other events occurring after his congressional testimony, filed the present lawsuit against IBP. As originally filed, Bagley asserted five separate and distinct claims against IBP. Due to attrition, however, only three of these claims are still a part of Bagley's lawsuit.

The first claim asserted by Bagley in the district court was a claim of libel arising out of statements made by IBP in the Peterson letter. As submitted to the jury, Bagley specifically challenged only two statements made by IBP in the Peterson letter: First, IBP's statement that "[Bagley] stole 7 boxes of IBP documents"; and second, IBP's statement that "Bagley's version of IBP's quantity discount program is absolutely false, and * * * constitutes perjury * * *." Trial Court Instruction No. 9.

The second claim asserted by Bagley was a claim of tortious interference with present employment. In that claim, Bagley contended that following his congressional testimony he was abruptly dismissed from Dubuque Packing Company (Dubuque), his then current employer. According to Bagley, that dismissal, coming only six days

after his testimony, was effectively caused by veiled yet intimidating threats made by IBP to Dubuque.

The final claim asserted by Bagley was a claim of tortious interference with future employment opportunities. In that claim, Bagley argued that IBP caused not only his termination by Dubuque but also effectively "blacklisted" him from the entire meat industry. While prior to his testimony and firing Bagley received repeated offers of employment, after these events offers of employment completely stopped and Bagley was unable to locate work in the meat industry.

Following a jury trial, Bagley prevailed on all three of these claims and was awarded a total of $9.33 million in damages and interest. IBP's appeal from these awards is now before the court.

## II. Discussion

### A. Libel

Before the district court, IBP asserted several defenses to Bagley's claim of libel. These defenses included claims of both common law and constitutional privilege. In essence, IBP asserted that the Peterson letter should be protected under either a common law testimonial or right to reply privilege or under a constitutional privilege based upon the first amendment right to petition. The district court rejected each of the privileges asserted by IBP.

The district court likewise rejected IBP's contention that Bagley should be held to be a public figure for purposes of this action and should be required to prove "actual malice" as defined by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). By contrast, the district court ruled that Bagley was a purely private figure for purposes of this lawsuit.

Finally, the district court ruled, again over objection, that in light of the harsh and unprivileged nature of IBP's statements, Bagley would not be required to prove the falsity of IBP's libelous statements. Rather, the district court held that

IBP would be required to prove the truth of its statement that Bagley "stole" IBP documents as well as its statement that Bagley committed "perjury" before the Subcommittee.

On appeal from a jury verdict awarding Bagley $1,000,000 in compensatory damages and $5,000,000 in punitive damages, IBP challenges each of these rulings by the district court. IBP also challenges a number of the district court's evidentiary rulings that it asserts were highly prejudicial, denied IBP a fair trial, and induced the jury to award constitutionally excessive punitive damages. With IBP's various contentions in mind, we turn to Bagley's libel judgment.

### 1. Common Law Privilege

Before the district court, IBP repeatedly asserted that under common law the Peterson letter was a privileged communication and could not be used by Bagley as a basis for recovery. In support of its position, IBP asserted two separate and distinct claims of common law privilege: (1) an absolute common law privilege applicable to statements made during the course of legislative proceedings; and (2) a qualified common law privilege protecting a party's ability to reply in an appropriate manner to public accusations.

While neither party has addressed the issue, we note initially that the question of qualified or absolute common law privilege, while not without federal implications in light of the involvement of a federal congressional subcommittee, is a question of state rather than federal common law. *See Webster v. Sun Co.*, 790 F.2d 157, 160 (D.C.Cir.1986); *Yip v. Pagano*, 606 F.Supp. 1566, 1569–70 (D.N.J.1985), *aff'd*, 782 F.2d 1033 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986); *Bio/Basics International Corp. v. Ortho Pharmaceutical Corp.*, 545 F.Supp. 1106, 1110–13 (S.D.N.Y.1982). Thus, to determine whether a common law privilege exists, we must look to Iowa substantive law, which IBP and Bagley both concede is generally applicable to this action.

As this court has previously indicated, in the area of libel, Iowa common law recognizes both absolute and qualified privileges. *See Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 697 n. 4 (8th Cir.1979); *Johnston v. Cartwright*, 355 F.2d 32, 35 (8th Cir.1966). Specifically, a review of the relevant Iowa case law indicates that under certain circumstances Iowa courts will recognize an absolute testimonial privilege, *see, e.g., Mills v. Denny*, 245 Iowa 584, 63 N.W.2d 222, 225 (1954), or a qualified right to reply privilege, *see, e.g., Haas v. Evening Democrat Co.*, 252 Iowa 517, 107 N.W.2d 444, 451–53 (1961). However, whether and to what extent a privilege will be applicable in a given case depends on the unique circumstances of that case and will be determined as a matter of law by the trial court. *Mills*, 63 N.W.2d at 227; *see also Johnston*, 355 F.2d at 35.

Here, the district court, after examining the available case law and after considering the occasion and circumstances giving rise to IBP's various distributions of the Peterson letter, rejected both claims of common law privilege. In so doing, the district court first concluded that IBP's widespread distribution of the Peterson letter to many individuals and entities totally unrelated to the Subcommittee's investigation could not reasonably be viewed as legislative testimony, and thus the letter fell beyond the narrowly defined scope of the testimonial privilege. The court also concluded that, although a right to reply privilege is available in certain cases, IBP's various distributions of the Peterson letter, under the circumstances of this case, went beyond an appropriate response to the Subcommittee's investigation and as a consequence were unprotected under Iowa law by a right to reply privilege.

In making these determinations, the district court was without benefit of any Iowa court decision clearly suggesting how the Iowa courts would themselves have resolved the particular questions of privilege presented in this case. In the absence of controlling state law, this court will ordinarily give significant deference to a district court's resolution of unclear questions of state law. *St. Paul Fire & Marine Insurance Co. v. Rock-Tenn Co.*, 787 F.2d 340, 341 (8th Cir.1986); *Northern States Power Co. v. ITT Meyer Industries*, 777 F.2d 405, 413 (8th Cir.1985).

Here, our own independent review of Iowa case law convinces us that the district court's rulings on the questions of privilege must be affirmed. While not unchallengeable, the district court's decisions are neither without support nor unreasonable. Thus, we decline to second-guess the district court's rejection of IBP's claims of absolute and qualified state common law privilege.

## 2. First Amendment Petitioning

IBP contends, however, that regardless of the availability of a common law privilege, its activities with respect to the Peterson letter are classic examples of petitioning activity entitled to some degree of first amendment protection. The district court rejected IBP's contention, in effect concluding that IBP's activities were entirely devoid of first amendment substance or value. In reaching that conclusion, we believe the district court clearly erred.

We note initially that the Supreme Court has recently reaffirmed the principle that petitioning, like "other guarantees of [the first amendment,] * * * is an assurance of a particular freedom of expression." *McDonald v. Smith*, — U.S. —, 105 S.Ct. 2787, 2789, 86 L.Ed.2d 384 (1985). This reaffirmation clearly underscores the co-equal status of the right to petition with other first amendment rights.

In reviewing IBP's claim that its actions were genuinely intended to influence the legislative process and thus constitute protected first amendment petitioning, this court is guided by *Eastern Railroad Presidents Conference v. Noerr Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642

(1972). While these cases involved antitrust rather than defamation claims, the principles underlying the Supreme Court's analysis in each of these cases are equally applicable to the present action and provide this court with a framework upon which to consider Bagley's challenge to the legitimacy of IBP's asserted petitioning.

■ Thus, before activities claimed to constitute first amendment petitioning will be stripped of all first amendment protection, the party challenging such an assertion must prove as a matter of fact, *see Independent Taxicab Drivers Employees v. Greater Houston Transportation Co.*, 760 F.2d 607, 612 n. 9 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985), that the challenged activities were not genuinely intended to influence the legislative process. In so doing, the challenging party must establish in part that the petitioning party has abused or corrupted the legislative process. *See, e.g., California Motor Transport Co.*, 404 U.S. at 511–16, 92 S.Ct. at 612–14; *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 486–88 (8th Cir.1985). Here, the record is devoid of any evidence to suggest IBP's actions in any way abused or corrupted the legislative process surrounding the Subcommittee's investigation.

■ For almost two years, the Subcommittee's investigation had centered on potentially anticompetitive business practices in the meat industry, of which IBP is a prominent and often controversial member. During that period, numerous charges had been directed against IBP, and by July of 1979, the central focus of the Subcommittee's investigation clearly was on IBP. In fact, Congressman Smith in his letter to IBP explicitly stated that any legislation adopted as a result of the Subcommittee's investigation would leave IBP as one of the companies "most affected." In this largely adversarial context, IBP answered the charges directed against it by writing to Congressman Smith and the other members of the Subcommittee.

We believe it is of no significance that IBP chose to respond to the Subcommittee's investigation by letter rather than appear before the Subcommittee. The right to petition is personal in nature, and IBP, rather than the Subcommittee or its chairman, has the right to determine how and in what manner that right will be exercised. If IBP's presence was absolutely necessary to the Subcommittee's investigation, the Subcommittee could have subpoenaed IBP as it had Bagley.

The Peterson letter itself provides evidence that IBP's actions constituted petitioning activity, genuinely intended to influence the legislative process. Significantly, in its letter, IBP did not raise issues not then before the Subcommittee, but rather limited its response to those topics already raised by the Subcommittee. That response was essentially two-fold. First, IBP responded directly to the various charges brought against it in an attempt to give its side of every issue. Second, IBP sought, when possible, to undermine the testimony of the various witnesses (including Bagley) by bringing to light their potential motives and biases. This overall response, precipitated not by IBP but rather by a significant congressional inquiry, was largely defensive in nature and supports IBP's claim that its actions constituted first amendment petitioning.

■ IBP's later redistribution of the IBP letter in no way undermines our conclusion. By its very nature, the right to petition the government goes beyond direct petitioning activity. Rather, the right to petition the government necessarily includes all manner and mode of communication directed not only to the government but also to those individuals and entities whose support and influence may contribute materially to the legislative campaign being waged. *See, e.g., Noerr Motors Freight, Inc.*, 365 U.S. at 142–43, 81 S.Ct. at 532.

Here, IBP's redistribution simply sought to inform and enlist the support of those elements of society believed by IBP to be interested in, potentially affected by, or in a position to influence the Subcommittee's investigation. Without these attendant

rights, IBP's first amendment right to petition would be rendered virtually meaningless in this case, particularly since the governmental body to which IBP's letter was directed chose not to make it a part of the body's formal public record.

■ By response, neither Bagley nor the district court identified any evidence to support a conclusion that IBP's actions did not constitute a genuine attempt to protect its interest by influencing the legislative process. No evidence was presented to suggest that IBP's actions were intended to or in fact perverted or in any way corrupted the legislative process. *See California Motor Transport Co.*, 404 U.S. at 511–16, 92 S.Ct. at 612–14; *see also Razorback Ready Mix Concrete Co.*, 761 F.2d at 486–88.

At bottom, regardless of IBP's ill will towards Bagley, *see Noerr Motor Freight, Inc.*, 365 U.S. at 132–45, 81 S.Ct. at 526–33, IBP's activities on their face clearly evidenced genuine petitioning activity. The district court's conclusion to the contrary was based on an erroneous interpretation of the applicable law, was unsupported by the evidence, and must be reversed. Thus, we hold that IBP's activities constituted genuine first amendment petitioning.

However, having concluded the district court erred in failing to recognize the nature of IBP's actions, we are not yet required to reverse Bagley's libel judgment. Rather, we must next identify the degree of protection to be accorded IBP's activities under the first amendment. After identifying the appropriate degree of protection, reversal will be required only if the district court's instructions failed to provide IBP with the appropriate level of first amendment protection.

### 3. Degree of First Amendment Petitioning

Before the district court and on appeal, IBP asserted that because first amendment petitioning was involved, its activities were entitled to an absolute constitutional privilege insulating it from all defamation liability. The Supreme Court, in *McDonald v.*

*Smith*, —— U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), has now rejected that position. 105 S.Ct. at 2791. Rather, in *McDonald*, the Court emphasized that "there is no sound basis for granting greater constitutional protection to [petitioning] * * * than [to] other First Amendment expressions." *Id.* at 2791 (citation omitted); *see also id.* at 2794 (Brennan, J., concurring).

■ Flowing from the Supreme Court's discussion in *McDonald*, we hold that in the area of defamation, first amendment petitioning is protected by the same constitutional principles identified by the Supreme Court as applicable in other cases involving defamatory first amendment speech. More specifically, we conclude the principles embodied in such cases as *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), are fully applicable to the present controversy.

The fact that cases such as *New York Times* and *Gertz* involved media defendants, while arguably relevant in identifying the particular first amendment freedom involved, is in our view irrelevant to the question of what level of constitutional protection that right is to receive. To recognize the existence of a first amendment right and yet distinguish the level of protection accorded that right based on the type of entity involved would be incompatible with the fundamental first amendment principle that "[t]he inherent worth of * * * speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, —— U.S. ——, 105 S.Ct. 2939, 2953 and n. 4, 86 L.Ed.2d 593 (1985) (White, J., concurring in result).

Since its decision in *New York Times*, the Supreme Court has sought an appropriate

balance between two important yet often conflicting interests: (1) the interest in assuring vigorous and robust debate on public issues; and (2) the interest in protecting the reputation of each individual from unjustified defamatory attacks. As the principles intended to protect these interests have been shaped and defined, the Supreme Court has made clear that to identify the appropriate level of protection applicable in a particular case, a court must focus its inquiry on the question of whether the person defamed is a public official, a public figure, or a private figure.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Supreme Court held that public officials and public figures may not recover in defamation unless they "prove[ ] that the [challenged] statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26; *see Curtis Publishing Co.,* 388 U.S. at 162, 87 S.Ct. at 1995 (Warren, C.J., concurring); *see also Gertz,* 418 U.S. at 335–36 and n. 7, 94 S.Ct. at 3005 and n. 7. The actual malice standard must be established by clear and convincing evidence, *id.* at 342, 94 S.Ct. at 3008, and is subject to independent rather than deferential appellate review, *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 513–14, 104 S.Ct. 1949, 1966–67, 80 L.Ed.2d 502 (1984).

While *New York Times* and *Curtis Publishing Co.* defined the constitutional limits applicable to the public official's or the public figure's right to recover for defamatory speech, it was not until *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), that the Supreme Court delineated the constitutional limitations applicable when the defamation action is brought by a purely private figure. In examining the question, the Supreme Court identified two central factors that distinguish private individuals from public officials or public figures.

First, the Supreme Court noted that public officials and public figures "usually enjoy significantly greater access to the channels of effective communication" than private individuals. *Id.* at 344, 94 S.Ct. at 3009. Thus, public officials and public figures are in a better position than private individuals to attempt to rebut and reduce the harm of a defamatory statement. *Id.; but see id.* at n. 9. Because private individuals have fewer avenues of this type of self-help open to them, their overall potential for injury as a result of defamatory speech is significantly increased and as a result so is the state's interest in protecting that individual from injury. *Id.* at 344, 94 S.Ct. at 3009.

Second, and more important, the Supreme Court emphasized that public officials and public figures, unlike private individuals, have purposefully sought to become involved in the affairs of society either by "seek[ing] [a] governmental office" or by otherwise assuming a role of particular "prominence in the affairs of society." *Id.* at 344–45, 94 S.Ct. at 3009. Thus, to that extent these individuals invite and indeed must expect public comment, praise, and criticism alike concerning their fitness to command the public's attention and support. By contrast, a private individual has sought neither office nor influence and as a result has assumed no prominent role in society's affairs and has given up no interest in the protection of his or her reputation. In tandem, these two factors suggest private individuals "are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery." *Id.* at 345, 94 S.Ct. at 3009.

In light of these considerations, the Supreme Court in *Gertz* concluded that states should be given significant leeway in providing a legal remedy to the defamed private individual. With this in mind, the Court left states largely free to develop standards of recovery applicable to private figures, limited only by the requirement that the states not impose liability without

fault. *Id.* at 347, 94 S.Ct. at 3010. The Supreme Court did provide, however, that although a simple showing of fault would allow a private individual to establish liability and recover actual damages, actual malice, as defined in *New York Times,* must still be established before presumed or punitive damages can be recovered. *Id.* at 348–50, 94 S.Ct. at 3011–12.

Since *Gertz,* the Supreme Court has in one instance apparently narrowed and in another instance further defined the applicability and requirements of *Gertz.* First, in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* —— U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), the Court determined that the *Gertz* limitation on the recovery of presumed and punitive damages should be applicable only when the defamatory statement involves a matter of "public concern." 105 S.Ct. at 2944–48. Matters of public concern go to the very core of the first amendment and encompass speech that is intended to effect political or social change or that is otherwise related to enlightened self-government. *Id.* at 2945–46. Absent speech of this nature, the balance of comparative interests shifts in favor of the state and allows a private individual to recover presumed and punitive damages without a showing of *New York Times* actual malice. *Id.* at 2946.

The second decision impacting the Supreme Court's decision in *Gertz* is *Philadelphia Newspapers, Inc. v. Hepps,* —— U.S. ——, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). In *Hepps,* as an initial point, the Court made clear that as a part of their defamation suit public officials and public figures must prove the falsity of the statements challenged. 106 S.Ct. at 1563; *see also id.* at 1570 n. 10 (Stevens, J., dissenting). More important for our purposes, the Supreme Court then went on to hold that in order to recover in defamation private individuals must not only demonstrate fault but must also prove that the defamatory statements were in fact false. *Id.* at 1563–64.

### 4. Bagley's Status

With the applicable constitutional standards now identified, this court must next determine Bagley's status for purposes of this lawsuit. If Bagley is a public official or a public figure, the *New York Times* actual malice standard will be applicable to Bagley's libel claim. If, on the other hand, Bagley is found to be a private figure, the less formidable *Gertz* standard, as modified in *Dun & Bradstreet* and *Hepps,* will be applicable to that claim. The question of Bagley's status presents an issue of law to be determined by the court. *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 740 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986); *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1081 n. 4 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); *cf. Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966).

As an initial matter, the parties are in agreement on two points. First, the parties agree that Bagley is not a public official. Second, the parties also agree that Bagley has not received such "pervasive fame or notoriety" that he can be viewed as "a public figure for all purposes and in all contexts." *Gertz,* 418 U.S. at 351, 94 S.Ct. at 3012. Further, we note that IBP does not contend that Bagley is one of those "exceedingly rare" individuals who with respect to the issues presented by this case can be considered an "involuntary" public figure. *Id.* at 345, 94 S.Ct. at 3009. Thus, our inquiry is narrowly limited to determining whether Bagley must be considered a limited public figure with respect to the narrow range of issues presented by his libel claim.

To resolve that question, our inquiry must begin with *Gertz.* Under *Gertz,* this court, in determining whether an individual should be considered a limited public figure, must focus its attention on the "nature and extent of an individual's participation in the particular [public] controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013. By so doing, the court will

be able to determine whether the individual has voluntarily and purposefully injected himself into that controversy in an attempt to influence the resolution of the issues there involved. *Id.* at 345, 351, 94 S.Ct. at 3009, 3012.

Applying the factors identified in *Gertz,* this court must first identify the "particular [public] controversy giving rise" to IBP's defamatory speech. *See id.; McDowell v. Paiewonsky,* 769 F.2d 942, 948 (3d Cir.1985); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C. Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980); *see also Wolston v. Readers Digest Association,* 443 U.S. 157, 166 n. 8, 99 S.Ct. 2701, 2707 n. 8, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979).

Although the Supreme Court has never explicitly identified those factors necessary to create a *Gertz* public controversy, the Court has made clear that simple newsworthiness alone will be insufficient to generate such a controversy. *Wolston,* 443 U.S. at 167, 99 S.Ct. at 2707. Further, purely private disputes (such as a lawsuit) whose impact is limited primarily to the parties involved, while often of interest to the public, will also be insufficient to create a *Gertz* public controversy. *Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). Rather, the Court, in identifying a *Gertz* public controversy, has focused its attention on those controversies involving questions of "public concern," *see Dunn & Bradstreet,* 105 S.Ct. at 2944–47, or, in other words, those controversies raising issues that might reasonably be expected to have an impact beyond the parties directly enmeshed in the particular controversy, *Waldbaum,* 627 F.2d at 1296–97.

Here, the particular controversy "giving rise" to IBP's defamatory letter was the Subcommittee's increasingly antagonistic inquiry into numerous IBP business practices. That investigation, which included a number of public hearings, generated substantial public comment and was widely reported in the media. Bagley's testimony alone generated well over a dozen news articles.

Further, the controversy generated by the Subcommittee's investigation, by its very nature, went beyond a purely private dispute that only by mere chance attracted the interest of the public. Rather, because the investigation had the potential to generate new legislation that might reasonably have been expected to affect both the meat industry and the consumer, the resulting controversy was in fact a "public" controversy, involving issues of significant public concern.

The Peterson letter itself was written in response to the Subcommittee's investigation and further demonstrates the well-defined public nature of the particular controversy here at issue. In that letter, IBP specifically and in detail responded to each of the charges leveled against it throughout the Subcommittee's investigation. Further, IBP explicitly recognized the relatively widespread interest in the Subcommittee's proceedings when in its letter IBP appealed directly to the "open-minded members of * * * [the] Subcommittee, the media, the cattle and beef industry, and the public" for support. Letter from IBP to Congressman Smith 4–5 (August 1, 1979). The record is clear and the Peterson letter establishes that the Subcommittee's investigation into IBP was the particular public controversy that "gave rise" to the defamation here at issue. *See Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013.

Having identified the particular controversy giving rise to the defamation, the court must next examine the "nature and extent" of Bagley's involvement in that controversy. *Id.* As previously stated, this inquiry is necessary to determine whether Bagley has "thrust [himself] to the forefront of [that] * * * controversy in order to influence the resolution of the issues [there] involved." *Id.* at 345, 94 S.Ct. at 3009; *see Waldbaum,* 627 F.2d at 1297–98.

■ Here, Bagley's involvement in the Subcommittee's investigation was a limited one. Bagley appeared under subpoena, as a witness, and cooperated with the Subcommittee as he had an obligation to do. That participation was limited to answering whatever questions the Subcommittee had about IBP or the IBP documents. Further, both before and after his congressional testimony, Bagley conscientiously avoided the media, making no public comment. In fact, outside the limited role of a subpoenaed witness, Bagley played no part in the policymaking or deliberative processes of the Subcommittee. And, the media attention that followed IBP's distribution of the Peterson letter provides no support for IBP's position because IBP cannot by its own conduct make Bagley a public figure. *Hutchinson,* 443 U.S. at 135, 99 S.Ct. at 2688.

■ In light of Bagley's limited involvement in the Subcommittee's investigation, this court cannot conclude that Bagley has purposely thrust himself into the legislative process in order to influence the resolution of the issues there involved. To do so would effectively deprive almost every witness appearing before a congressional subcommittee of his or her status as a private citizen. Such a result would be unnecessarily harsh and would largely ignore the valuable role private individuals play in the legislative process. Further, private individuals with relevant information would become hesitant to cooperate with a congressional inquiry and would thus deprive Congress of a valuable source of information.

■ IBP contends that the focus of this court's inquiry with respect to the nature and extent of Bagley's activities is far too narrow. In support of that position, IBP focuses its attention on the events leading to its lawsuit against Bagley in which IBP sought the return of the IBP documents. Specifically, IBP points to the number of instances in which Bagley met with and provided IBP documents to various individuals who for one reason or another were interested in IBP's business practices. IBP contends that these activities were freely and voluntarily undertaken by Bagley and are sufficient to strip Bagley of his status as a private figure. We disagree.

Assuming Bagley's various activities are at all relevant to the question of whether he is a public or private figure, we still conclude they cannot deprive Bagley of the mantle of private person status. First, despite meeting with various individuals, Bagley never sought or received any public attention as a result of these meetings. Rather, his meetings with these individuals were entirely private and nonpublicized. In fact, it appears that Bagley was not even the individual who initiated these meetings. Further, it is not determinative that Bagley should have known his actions might lead to a lawsuit or might consitute a breach of his contractual agreement with IBP. *Cf. Wolston,* 443 U.S. at 167–68, 99 S.Ct. at 2707.

Second, regardless of his purpose in meeting with and providing documents to these individuals, the outcome of these activities was a purely private lawsuit. The issues involved in that controversy, even if newsworthy, were purely private in nature and were unlikely, upon resolution, to have any significant impact beyond the parties immediately involved. Further, in relation to this lawsuit Bagley sought no public audience and did not attempt to use the court's forum to influence the resolution of any issue being considered by the Subcommittee. *See Time, Inc.,* 424 U.S. at 454 n. 3, 96 S.Ct. at 965 n. 3. This purely private dispute is neither a "public" controversy nor does Bagley's involvement in it label him a public figure. *Id.* at 454, 96 S.Ct. at 965.

We also reject IBP's contention for a more fundamental reason. Namely, the activities relied on by IBP were distinct from and unrelated to Bagley's involvement in the particular public controversy "giving rise" to the Peterson letter. Very simply, Bagley's meetings with various individuals as well as his involvement in IBP's lawsuit seeking to recover the IBP documents impacted no issue before the Subcommittee

and involved a purely private controversy of no interest to the Subcommittee. Congressman Smith, in opening the July hearings, expressly stated that the Subcommittee was "not interested directly or indirectly or even remotely in [Bagley's legal] skirmishes [with IBP]." *Small Business Problems in Marketing of Meat and Other Commodities*, 96th Cong., 1st Sess. at 5. In large part, Bagley is much like the plaintiff in *Gertz* who, despite being active in community and professional service, publishing several books and articles, and representing a client on a civil matter related to the controversy at issue in that case, was insufficiently involved in the particular public controversy "giving rise" to the defamation that he could not be classed as a public figure with respect to that "particular controversy." *Gertz*, 418 U.S. at 351–52, 94 S.Ct. at 3012–13.

We conclude that although Bagley's various meetings may have "given rise" to IBP's lawsuit against Bagley, those meetings were no part of Bagley's participation in the Subcommittee's investigation, which for purposes of this case is the "particular [public] controversy giving rise to [IBP's defamatory letter]." *Id.* at 352, 94 S.Ct. at 3013. Rather, these meetings were part of a purely private dispute between IBP and Bagley. Thus, given Bagley's limited role in the Subcommittee's investigation of IBP, we conclude that for purposes of this lawsuit Bagley must be considered a private figure.

### 5. Bagley's Libel Judgment

■ Having concluded that Bagley is a private figure and further because the speech here at issue involves matters of public concern, *see Dunn & Bradstreet, Inc.*, 105 S.Ct. at 2947, we are now in a position to identify the elements of recovery constitutionally necessary to support Bagley's libel judgment. First, in light of *Hepps*, Bagley must prove IBP's statements that Bagley "stole" documents and committed "perjury" were in fact false. *Hepps*, 106 S.Ct. at 1563–64. Second, Bagley must establish that IBP was at "fault"

in publishing these statements. *Gertz*, 418 U.S. at 347, 94 S.Ct. at 3010. Finally, to recover presumed or punitive damages, Bagley, in addition to proving falsity, *Hepps*, 106 S.Ct. at 1563, must prove by clear and convincing evidence that IBP's actions in publishing the challenged statements constituted "actual malice" as defined in *New York Times*. With the components necessary to support Bagley's judgment now identified, we conclude that Bagley's libel judgment must be reversed.

■ At trial, the district court determined the statements in IBP's letter that Bagley "stole" documents and committed "perjury" in his congressional testimony were libelous per se and thus under Iowa law were presumed false. On that basis, and over objection, the district court instructed the jury that to avoid liability IBP, by a preponderance of the evidence, must prove that the statements challenged were in fact true.

As we previously noted, the Supreme Court has now made clear that in *Gertz*-type cases the plaintiff must bear the burden of proving that the challenged statements were false. *Hepps*, 106 S.Ct. at 1563–64. Thus, because Bagley was not required to prove the falsity of IBP's statements as required by *Hepps*, Bagley's libel judgment must be reversed unless this court can determine that this failure constituted harmless error.

■ Bagley argues that any error is harmless in light of proper punitive damage instructions and a separate, identifiable award of punitive damages. While a separate award of punitive damages supported by proper instructions and a proper showing of proof may in certain cases render an erroneous compensatory damage instruction harmless, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 166, 87 S.Ct. 1975, 1997, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring), we conclude that such is not the case in the present action.

Consistent with *Gertz*, the district court instructed the jury that Bagley could recover punitive damages only if he demonstrat-

ed by "clear and convincing" evidence that IBP's actions were motivated by actual malice. Trial Court Instruction No. 27; *see Gertz*, 418 U.S. at 348–50, 94 S.Ct. at 3011–12. Further, the district court properly defined actual malice as "[a] publication * * * made with * * * knowledge that it is false, or with reckless disregard of whether it was false or not." Trial Court Instruction No. 28; *see New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 725–26.

These instructions, however, while requiring Bagley to prove actual malice, do not specifically require Bagley to prove that the challenged statements were false. And, in *Hepps*, the Supreme Court made clear not only that proof of falsity was an additional component that must be borne by all first amendment defamation plaintiffs, but that fault and falsity are two separate and distinct elements of recovery. *Hepps*, 106 S.Ct. at 1561–65.

Here, the only express instruction of the district court dealing with the burden of proving truth or falsity placed the burden squarely on IBP. Trial Court Instruction No. 9. The district court's instructions on punitive damages, while distinct from the liability instructions, are entirely silent on the issue of truth or falsity. Trial Court Instructions Nos. 27–29. Thus, this court is unable reasonably to determine whether the jury's award of punitive damages flowed from the preliminary conclusion that Bagley proved the falsity of the challenged statements or that IBP had simply failed to prove their truth. And, as *Hepps* makes clear, a proper allocation of the burden of proving falsity is a constitutional requirement. *Hepps*, 106 S.Ct. at 1563–65.

Because we cannot reasonably conclude the punitive damage award reflected a finding of falsity on the part of the jury and as a result was untainted by the burden of proof instruction contained elsewhere in the district court's instructions, it is impossible to determine whether the award was made on a permissible or impermissible basis. Thus, the punitive damage award cannot serve to render the prior error harmless, and Bagley's libel judgment must be reversed and that claim remanded for a new trial. *See New York Times Co.*, 376 U.S. at 284, 84 S.Ct. at 728; *see also Greenbelt Cooperative Publishing Association v. Bresler*, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970).

Given the need for a new trial based upon Bagley's status as a private person and because any judgment for actual damages recovered by Bagley will not depend on an actual malice determination, we need not independently review the record for evidence of actual malice. *See Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1985). At that trial, Bagley will undoubtedly present any and all evidence of fault, including evidence of actual malice, then available to him. Once this evidence has been presented, the district court, bearing in mind the exacting standard applicable to questions of actual malice, will be in a position to determine whether Bagley's claim for punitive damages can properly be considered by the jury.

We also have no need to address IBP's various evidentiary challenges. We do note, however, that the rulings challenged by IBP, even if erroneous, were not so prejudicial as to deny IBP a fair trial and require the reversal of Bagley's other judgments. On retrial of Bagley's libel claim, IBP is free to challenge again the court's rulings, and, in light of the relatively narrow issues to be tried, the district court should consider not only whether this evidence is relevant to the issues being tried but also whether the probative value of these various pieces of evidence is sufficient to outweigh their potentially prejudicial effect.

### B. Tortious Interference

We now turn to IBP's challenge to Bagley's claim of tortious interference with present employment. The jury awarded Bagley $150,000 in compensatory damages and $500,000 in punitive damages on that claim. With one modification relating to

the district court's award of prejudgment interest, we affirm.

At the time of his testimony before the Subcommittee, Bagley was employed by Dubuque Packing Company (Dubuque), a competitor as well as a rival of IBP. Six days after his testimony, Bagley was abruptly and without warning fired by Dubuque. At trial, Bagley presented several pieces of evidence from which a jury could have concluded that certain actions on the part of IBP were the cause of his firing. Although IBP presented evidence that Bagley's firing was unrelated to any action on the part of IBP, the jury obviously rejected IBP's evidence and accepted Bagley's.

Because Bagley's position is not without substantial support, we are in no position to second-guess the jury that heard and was in a position to weigh the competing evidence. IBP, in its brief, essentially concedes the competing evidence created a question of fact to be resolved by the jury. Appellant's Brief at 66. Thus, we conclude the judgment in favor of tortious interference with existing employment must stand.

We turn next to IBP's challenge to the district court's judgment in favor of Bagley on his claim of tortious interference with future employment opportunities. The jury awarded Bagley $100,000 in compensatory damages and $250,000 in punitive damages on that claim. We affirm the determination of liability on this claim, but remand the claim to the district court with instructions.

As an initial point, IBP argues that Bagley's claim of tortious interference with future employment opportunities is duplicative of his libel claim and thus provides no independent basis of recovery. Because we conclude that facts separate and apart from Bagley's libel claim support his tortious interference with future employment claim, we reject IBP's position.

From the evidence presented at trial, the jury could reasonably have found the following facts. Prior to his congressional testimony, Bagley was highly regarded in the meat industry, had a good reputation for honesty, ability, and integrity, and received numerous offers of employment. After that testimony, however, Bagley was fired from Dubuque at IBP's instigation. Further, Bagley was effectively "blacklisted" from the meat industry as a whole by IBP, and it was made clear to Bagley that he would never work in the meat industry again. The offers of employment stopped and, with one minor exception, Bagley has not again been able to obtain work in the meat industry.

These findings support the jury's determination of liability in favor of Bagley on this claim and would ordinarily justify an affirmance of the damages awarded. However, we agree with IBP that Bagley's recovery of damages on this claim has the potential to be duplicative of whatever damages Bagley may eventually recover on retrial of his libel claim. Consequently, we vacate that portion of the judgment awarding damages on the claim of tortious interference with future employment opportunities and remand that claim to the district court subject to the ultimate resolution of Bagley's libel claim.

If Bagley fails to recover on his libel claim, the award of damages should be reinstated. If Bagley recovers on his libel claim, however, the district court should then determine to what extent a recovery for tortious interference with future employment would duplicate his libel recovery. To the extent of any duplication, the award of damages on that tortious interference claim should not be reinstated.

Finally, with respect to each of Bagley's three claims, IBP challenges the district court's award of prejudgment interest to Bagley on the punitive damage awards recovered by him. Specifically, IBP argues that the district court erred in awarding prejudgment interest on those awards. After considering this issue of Iowa state law, *Sedco International v. Cory,* 683 F.2d 1201, 1212 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982), we agree.

Although unclear at the time of the district court's ruling, the Supreme Court of Iowa has now held that prejudgment interest may not be recovered on an award of punitive damages. *Midwest Management Corp. v. Stephens*, 353 N.W.2d 76, 82 (Iowa 1984). Thus, we reverse the district court's award of prejudgment interest on Bagley's punitive damage awards.

### III. Conclusion

We reverse Bagley's libel judgment and remand that claim for a new trial. With one exception, we affirm the district court judgment and award of damages on Bagley's claim of tortious interference with present employment. Finally, we affirm the district court judgment with respect to Bagley's claim of tortious interference with future employment opportunities to the extent of liability; however, because this recovery has the potential of being duplicative of any award that might be recovered by Bagley on his libel claim, we vacate that portion of the judgment and remand that claim to the district court with instructions.

BRIGHT, Senior Circuit Judge, and McMILLIAN and ARNOLD, Circuit Judges, concurring in part and dissenting in part.

We agree with the majority's conclusion that the district court erred in the libel action by placing on IBP the burden of proving that Bagley "stole" the documents and committed "perjury." We further agree that this allocation of the burden of proof did not constitute harmless error. *See Philadelphia Newspapers, Inc. v. Hepps*, — U.S. —, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). We therefore concur in the majority's decision to reverse the libel judgment for Bagley, and remand the action to the district court (Majority Opinion at 647–48).

We also concur with the majority's holding rejecting IBP's claim to a common law

privilege (Majority Opinion at 639–40) and with its conclusion that IBP's activities constituted genuine petitioning activity (Majority Opinion at 640–42). Finally, we agree that the judgment for Bagley on his action for tortious interference with present employment should be sustained, subject to striking the prejudgment interest on the punitive damages award. *See* Majority Opinion at 648–649.

In other respects outlined in this dissent, we disagree with the majority.

Our views on all issues before this en banc court have been fully addressed in the opinion authored by Judge Bright for the panel majority that initially heard and decided this case. *Bagley v. Iowa Beef Processors, Inc.*, 755 F.2d 1300 (8th Cir.1985). We need not again repeat that opinion here. We expressly adopt the opinion of the panel,[1] and as stated in that opinion, we would hold that Bagley, for the libel action, occupies a status analogous to a limited public figure in a media case and therefore must bear the burden of proving IBP made the statements here in question with "actual malice." *Id.* at 1314–17; *see New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

We would therefore remand this case to the district court for a determination, from the record, whether Bagley submitted sufficient evidence for a jury to find that IBP acted with actual malice. 755 F.2d at 1317. If the district court concludes that Bagley produced sufficient evidence, there should be a new trial on the libel action with Bagley bearing the burden of proving actual malice to establish liability for the alleged defamation.

With respect to the propriety of the claim for tortious interference with future employment (Majority Opinion at 648–49), we disagree that the determination of liability should stand. In our view, that award will not stand as a claim separate from the cause of action for libel. As we

---

1. We observe that the analysis of the panel on Bagley's libel claim has received support from subsequent decisions of the Supreme Court. *See Philadelphia Newspapers, Inc. v. Hepps*, —

U.S. —, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *McDonald v. Smith*, — U.S. —, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985).

stated previously, "[i]f on remand, Bagley establishes IBP's liability for libel, he should be allowed to recover for the adverse impact on his future employability." 755 F.2d at 1318.

Thus, in remanding for a new trial, we would direct the district court to proceed in a manner consistent with the opinion of the panel initially hearing this case and reported at 755 F.2d 1300 (8th Cir.1985).