Filed 1/25/23  Marvel v. Walgreen Co. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| ROBERT R. MARVEL, | C093806 |
| Plaintiff and Appellant, | (Super. Ct. No. CV-2019-707) |
| v. | |
| WALGREEN CO. et al., | |
| Defendants and Respondents. | |

SUMMARY OF THE APPEAL

Plaintiff Robert R. Marvel brought an action alleging defendant Walgreen Co. (Walgreens) discriminated against him based on his race and national origin after they fired him for allegedly using the term "wetback" when speaking with defendant Irma Moreno (with Walgreens, defendants).  He also alleged that both Moreno and Walgreens defamed him when reporting that he used the word "wetback" when speaking with

1

Moreno. Marvel insists he never used the work "wetback" and that he instead used the term "wet vac." Defendants brought a motion for summary judgment, which the trial court granted. The trial court then entered a judgment in defendants' favor. Plaintiff appeals. We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

### A.      Marvel's Employment and Walgreens's Anti-Discrimination Policy

Marvel was employed as a senior maintenance mechanic for Walgreens at its distribution center (center) in Woodland, California. He was an at-will employee who understood he could resign from his job at any time or Walgreens could terminate his employment with or without cause and without notice. Marvel says his national origin is American.

Walgreens maintains an anti-discrimination and harassment policy that prohibits unwelcome comments or conduct based on an individual's protected class. Identified protected classes include race and national origin (policy). Epithets and slurs are within the scope of prohibited verbal harassment. An employee who is found to have violated the policy is subject to discipline up to and including termination.

When Brenda Merriweather, a human resources generalist, testified on behalf of Walgreens as a person most knowledgeable, she stated the policy "can be considered [a] zero tolerance" policy against harassing and discriminatory behavior in the workplace. Merriweather said the policy applies to everyone who works in the center.

### B.      Interactions Between Marvel and Moreno

#### 1.      Call for Help with a Spill

On December 3, 2018, Marvel received a radio call from an unknown caller requesting assistance to clean up an oatmeal spill in an area of the center known as C-1 ("Charlie One"). In his deposition, Marvel testified the person calling from C-1 was

2

looking for someone to bring a "wet vac" to clean up the spill. Marvel called the utilities department and spoke with Moreno who performed janitorial duties. She agreed to help. Marvel also testified in his deposition that the person calling from C-1 heard Marvel ask Moreno if she could help clean up the spill, but the person who was calling said, "no" and said the workers in C-1 just needed someone to bring them a wet vac. Marvel testified that he then returned to what he had been doing before the call came in.

### 2. First Discussion in the Break Room and Report to Alvarado

Later in the day Marvel was in the break room. Again according to Marvel's deposition testimony, he was there to see if Willis Leih, a colleague, would need Marvel to take over watching the work of two contractors who worked for a company called EMCOR who were repairing a pipe that had burst in the ceiling the prior weekend. Marvel saw Moreno in the break room, and she told him that when she arrived at C-1 earlier, "the person" gave her a broom to clean up the spill.

Marvel and Moreno gave different versions what they each said to the other during this conversation.

On the one hand, Marvel said when Moreno told Marvel the person in C-1 had handed her a broom and wanted her to clean up the oatmeal spill, Marvel responded, "no, he wanted someone to bring him a wet vac." Marvel testified when he responded to Moreno's statement, "she repeated it again, so I repeated the same answer."

On the other, Moreno wrote in a declaration, "Mr. Marvel walked into the break room towards me. As he was walking towards me, he was clapping his hands and saying in a loud voice, 'Irma, you're doing a marvelous job, thank you, thank you!' I asked him if he was saying that to me because I had cleaned up the spill in Charlie One. I heard Mr. Marvel respond, 'I just sent any wetback to clean up.' I was shocked. I asked him, 'Mr. Robert Marvel, what are you saying to me?' I again heard him say, 'I just sent any wetback to clean up.' I asked him, 'Are you saying this because I came on Saturday to

3

clean up the water that spilled?' I said this because I wanted to be sure I had heard him correctly. I heard him say for the third time, 'I just sent any wetback to clean up.' I was very hurt, insulted and offended by what Mr. Marvel said to me. I felt that he was making fun of me. I was born in Mexico which makes me of Mexican descent. . . . I gave him two chances to clarify what he was saying, but each time, he repeated the same statement." Moreno gave a similar version of events in her deposition.

Moreno tried to report her conversation with Marvel to the human resources department and asked to speak with Kara Jimenez, a human resources specialist who spoke Spanish. Because Jimenez had already left for the day, Moreno spoke with Julio Alvarado. She complained that Marvel had called her a "wetback."

In his declaration submitted in opposition to the motion, Marvel said he never used the word "wetback" when speaking to Moreno, and he has never used the word "wetback" to refer to another person at work.

### 3. Second Discussion in the Break Room

Moreno and Marvel gave slightly different versions of what happened later in the day, but they agree that toward the end of the day they again encountered one another in the break room and, during this conversation Moreno referred to herself as a "wetback."

According to Moreno's declaration, she tried to address the "hurtful comment [she] heard Mr. Marvel make earlier." To highlight her value as a person, she started by telling him about a house she was going to close on that night, and that she owned real property, including a coffee plantation in Mexico. "To emphasize that I had heard what Mr. Marvel had called me and that I did not like it, I sarcastically referred to myself as a 'wetback,' saying 'This wetback is waiting for her retirement. I'm going to go to Mexico. This wetback is going to sign some documents for my third house in the United States.' "

In her deposition, Moreno admitted that she was angry when she spoke with Marvel the second time.

Marvel testified however, he was in the break room watching the EMCOR workers. Moreno came in and he asked her to mop up some water that had spilled from a hose, which she did. He testified that when he thanked her, she told him she was going to sign on her third house in America that night and she owned a house and coffee plantation in Mexico. He testified that when he said she was doing well for herself and seemed all set for retirement, she said, "not bad for a wetback." Marvel had no idea why she responded that way.

C.    The Investigation into Marvel's Conduct

1.    Management Request for an Investigation

On the morning of December 4, 2018, there was a meeting attended by members of a senior management group known as "Tier 4." They told Merriweather of Moreno's complaint and asked her to meet with Marvel, tell him about the complaint, and get a written statement from him. According to Merriweather's declaration, she was "notified" of an email Alvarado had sent to his supervisor, which said, "[o]n 12/3/2018 at approximately 16:05, Irma from Utilities came up to AP office and asked if Kara was in HR. I told her that she had just left for the day. She told me that she was very upset due to something that Bob Marvel had said to her. So prior to Irma coming up to AP, there was a little bit of water in the front break room right next to where the water leak incident happened not to [*sic*] long ago. Bob Marvel asked Irma to clean up the water but at the time she was busy, so Bob told Irma to get any WETBACK to clean up the water. She asked him to repeat himself and without hesitation he repeated for her to get him any WETBACK for clean up [*sic*]. Irma was very upset and offended."

2.      Meeting Between Merriweather and Marvel and Subsequent Phone Call

Merriweather met with Marvel on December 4, 2018, in the presence of his supervisor.  During the meeting between Merriweather and Marvel, she asked him about conversations regarding spills in the break room the day before and if he heard any ethnically insensitive comments.  In his deposition, Marvel testified he told Merriweather he had asked Moreno to clean up some water, and she had said she was on a break so he asked her to clean it up when she was finished.  He later saw her mopping the water up.

Marvel also testified that he thought Merriweather's questions during the interview were open ended, and he was answering to the best of his ability.  He said she was not explaining to him what was happening and Merriweather was vague to the point where he did not really know what she was talking about.

Marvel told Merriweather that Moreno had said, " 'not bad for a wetback.' " During the meeting, Marvel wrote a statement.  The first handwritten paragraph of the statement says, "I ask Irma [Moreno] to mop water in [b]reakroom area while I removed the hose.  She said she was on [b]reak.  I said ok.  I took out the water hose[.  W]hen I returned she was mopping the floor.  I said thank you[;] I appreciate it.  I told 4 or 5 others to be careful and watch their step because the floor is wet."  Then he signed and dated the statement, and he wrote a second paragraph below his signature which says, "[a]t one point Irma was telling me she was buying her 3rd house tonight and she has her house in Mexico and her coffee farm and she said something like not bad for a wet vac or wetback."

At the end of the meeting, Marvel was suspended pending a further investigation, and he left the center.

Marvel also testified that as he drove home he thought about his discussion with Merriweather and tried to figure out what was happening.  He said he remembered his

6

conversation with Moreno and the call for a wet vac. He testified he "kind of put it all together" and "then it made sense why she said, [']not bad for a wetback.['] " He testified he called Merriweather to tell her he believed "this is where the misunderstanding happened." He testified he told Merriweather he used the term "wet vac twice" in the break room. He testified he told Merriweather he thought that during a conversation he had with Moreno in the break room, Moreno probably believed he had said, "wetback" when he had actually said, "wet vac." He testified he never said anything to the effect that he may have used the term wetback. He testified the call took place after he got home, around 10:15 a.m. He testified when asked who else might have been in the break room when he spoke with Moreno, he identified the two contractors from EMCOR.

In his declaration in opposition to the summary judgment motion, Marvel reiterated that he did not tell Merriweather he had used the word "wetback" when speaking with Moreno, and he had, in fact, "expressly told Ms. Merriweather that I never used the word 'wetback.' "

In a declaration submitted in support of the motion for summary judgment, and in a statement Merriweather says she prepared after the phone call, Merriweather presents a different recollection of the telephone call. According to the declaration, during the call, Marvel told Merriweather he had thought more about the incident and recalled Moreno had cleaned the oatmeal spill. She heard him say he may have used the slang "wetback" and that comment may have been overheard by staff at EMCOR. Immediately after the call, she documented the conversation, which is her custom. The statement says "12/4/2018 [¶] 10:15 AM [¶] Received call from Bob Marvel stating that when he and Irma were cleaning up area that had spilled oatmeal he may have used the slang wetback that may have been overheard by staff of [EMCOR] and that he wanted to phone that information after rethinking the suspension. [¶] [signature]" During her deposition, Merriweather provided a similar description of the phone call, testifying, "Mr. Marvel

7

called me on my line and indicated that he had had an opportunity to think about our conversation and that he wanted to let me know that he had used [the] term of 'wetback' and that he felt that he wanted to tell me that. And I thanked him and ended [the] conversation."

Marvel's housemate Michael Jankowich signed a declaration in opposition to the motion. Jankowich says he heard Marvel's side of the conversation with Merriweather. Jankowich said Marvel never said or implied Marvel and Moreno cleaned an area that had spilled oatmeal. Jankowich said Marvel did not say he may have used the slang "wetback" and he never stated or implied he used the word "wetback" when speaking to Moreno. According to Jankowich, Marvel told Merriweather the person making the original request to clean up the oatmeal spill had called for a "wet vac." He heard Marvel say he thought there may have been a misunderstanding by Moreno because Moreno may have misunderstood Marvel to say "wetback" when he said "wet vac."

### 3. Moreno's Statement

According to Merriweather's declaration filed in support of the motion, she asked Kara Jimenez to take a statement from Moreno, because Jimenez speaks Spanish and she believed Spanish was Moreno's first language. Merriweather said Jimenez met with Moreno and gave Merriweather a written statement in Spanish that was translated into English. Moreno also claims she met with Jimenez, and that Jimenez took her statement. In her declaration, Moreno authenticated the statement she wrote in Spanish, and stated an attached document is the English translation prepared by Jimenez.

The English translation says, "Bob Marvel called me for a liquid spill on C1 after he sent me to clean an oatmeal spill that was spread out all over the floor of C1. Later, I went to the cafeteria and he yelled at me 'Thank you. You do a great job. Wonderful. Everything is clean. Thank you. Thank you.' This seemed weird to me because he hardly ever speaks to me except when it is essential. I asked him if he was saying that

8

because I cleaned C1 when it is split [*sic*] cases's job to clean it. He said, 'Oh. I only sent any wetback to clean up.' I asked him 'what are you saying?' He repeated what he said. I said 'Are you telling me that because of what happened on Saturday when the pipe broke and I got my back wet'? [¶] Later, at the time we were getting ready to leave, I told Bob 'you know what Bob? This wetback is signing papers on her 3rd house tonight. In Mexico, this wetback has a house and a ranch that is waiting for me when I retire. This wetback will spend all of her green paper in Mexico.' He asked me 'So what are you going to do? Are you going to live in Mexico?' I responded that I will live in Mexico for 6 months and live here for 6 months." On the bottom is typed "Translated by Kara Jimenez."

When deposed, Jimenez could not recall meeting with Moreno to take her statement or to interview her about the incident. She could not recall translating the statement. Jimenez did state that when she translates a statement from Spanish to English, it is her practice to denote she was the one to do the translation in the way the English translation of Moreno's statement is marked with "Translated by Kara Jimenez."

### 4. Statement of Willis Leih

According to Merriweather's declaration, on December 4, 2018, Merriweather interviewed Willis Leih, who had been identified by Marvel. Leih was unable to state whether Marvel had made a derogatory comment to Moreno because he could not hear the entire conversation between Marvel and Moreno, but he did recall them having a conversation. Leih believed Moreno had been asked to clean up the area. Merriweather asked Leih to provide her with a written statement, which, according to Merriweather, he later did. It says in typed words, "[o]n Monday there was a conversation between Bob and Irma [a]bout a call that come in over the radio for an oatmeal s[p]ill on C6. They asked for a shop vac or wet vac to clean the spill up. I believe Bob was thanking Irma for cleaning up the spill because Bob was working on something else at the time of the call."

9

Then, someone wrote by hand, "[t]hey walk around the corner and continued the conversation out in the break room. I was still in the area w[h]ere the food is. [¶] [signature] [¶] Willy Leih [¶] 12/5/18"

When deposed, Leih testified he met with Jimenez regarding what he observed between Marvel and Moreno, not Merriweather.

### 5. No One Met with EMCOR Personal

In her deposition as a person most knowledgeable on behalf of Walgreens, Merriweather admitted she made no effort to contact the EMCOR workers, and she was not aware of anyone trying to contact them. She said there is no policy prohibiting Walgreens from contacting third parties regarding internal investigations, though the typical protocol would be to have someone from the protection team located in San Francisco make the contact. When she testified on her own behalf, she stated she would not normally contact a vendor or third party.

### 6. Marvel's Termination

According to Merriweather's declaration submitted in support of the motion, on December 5, 2018, Merriweather provided the Tier 4 management team with statements by Marvel, Moreno, and Leih and her notes from her call with Marvel. Based on the statements and Marvel's conversation with Merriweather, Tier 4 advised that it believed Marvel had violated the policy and his employment should be terminated. They asked her to consult with the Employee Relations group.

When deposed as a person most knowledgeable on behalf of Walgreens, Merriweather agreed that the decision to terminate Marvel was based "exclusively and entirely upon the allegation that he called Irma Moreno a wet back . . . ."

On December 10, 2018, Merriweather informed Marvel that he was discharged. Marvel testified during his deposition that when he went into the center to drop off his uniforms and pick up his final paycheck he asked Merriweather why he was being fired,

and she said he was being terminated for using the "wet b word." Marvel testified he told her he "never used that word," and she responded, "well, that's the company's decision." Marvel testified at his deposition that this was the first time he had been specifically told his alleged use of the word "wetback" was why he was being investigated and disciplined.

Marvel was presented with a disciplinary report that documented his termination.

The report identifies the "DESCRIPTION OF THE PROBLEM" as "Gross Misconduct." It identifies "CURRENT FACTS" as "Robert, a complaint was filed reference [*sic*] your reported use of discriminatory language. As a result, you were suspended on Tuesday, December 5, 2018, [*sic*] pending an investigation into this matter." Under "CONSEQUENCES" it says, "Robert, unfortunately, the outcome of our investigation has resulted in the decision to proceed with a change in employment relationship with your dismissal. Your employment with Walgreens has ended effective today, December 10, 2018." In the space for "Team Member Signature" (Marvel's) it says, "TM refused to sign."

D.     Lack of Investigation into Moreno's Use of the Word "Wetback"

When she was deposed as a person most knowledgeable representing Walgreens, counsel asked Merriweather if she did anything to investigate the conversation that Marvel described in his written statement, in which he wrote about Moreno using the word "wetback." Merriweather said she did not. Counsel asked Merriweather why the policy against discrimination and harassment was not enforced against Moreno after Moreno submitted her statement in which she wrote she used the word "wetback." Merriweather responded, "I don't know."

E.     Who Was Informed of the Allegations and Findings

Walgreens's policy is to not disclose to individuals outside the company the reasons for an employee's separation from employment. Walgreens also does not

directly respond to inquiries regarding a former employee's employment history. It uses a third-party vendor which simply provides the dates of employment and the positions held.

In addition to the people she spoke with as part of lodging her complaint and participating in the investigation, Moreno told four other people at work about Marvel using the word "wetback" with her. She told Mercedes Parra, another Mexican. According to Moreno, Mercedes said something about going to human resources and mentioned that their English is not good. Moreno responded she knew that, but that Marvel said it three times. Moreno also told two women who were at the computer where the oatmeal was spilled, because "they were there." The next week, after Marvel was terminated, she thinks she spoke with Bernardino Arrellano, "[b]ut that day when I got there to work the entire warehouse already knew."

F.     Statements Made by Marvel During His Deposition Regarding the Incident, His Prior Interactions with Moreno and Merriweather, and Reasons for His Termination

During his deposition, counsel asked Marvel if, when he tells people what happened between him and Moreno, he tells them it was a misunderstanding, and Marvel replied, "[y]es." Counsel asked Marvel if that is what he believed happened, and, again, Marvel replied, "[y]es." Marvel explained, "I honestly feel that she thought I said wetback, but I did not, and that's why I called [Merriweather] to try and let her know." He later said, "she obviously thought I said something I didn't say."

When discussing his telephone conversation with Merriweather, he said, "my name is Marvel. I constantly have people spelling it M-a-r-b-l-e -- bel. I constantly have to say V as in Victor. So maybe she misunderstood when I called her back and said I did use the word wet vac twice, she may have misunderstood what I said also. I don't know. I can't tell you what was in her head." When asked to elaborate on why people often spell his name with a "b" instead of a "v," he responded, "[b]ecause V and B sound a lot

12

alike." When asked if he says "b" and "v" clearly, or if they come out sounding the same to him, he responded, "I believe they oftentimes sound somewhat the same. I also wear . . . partial dentures, and I don't know if I had them in at the time I was talking to [Merriweather] or not."

Marvel testified that he has known Moreno the entire time he has worked at the center, which is about 13 years. He said he had never had any problems with her in the past. He also never saw or heard Moreno do anything to suggest she had a bias against any particular group of people because of their race or national origin. He never heard of anyone having a type of bias due to race or national origin.

Marvel also testified about prior interactions with Merriweather. When asked if he had any understanding or concern that she had a bias against people because of their national origin or race, he responded, "[a]bsolutely not. She is very nice and friendly to everyone."

When asked about his termination at his deposition, Marvel admitted he was never told he had been fired for any reason other than his reported abuse of discriminatory language.

G.      Proceedings in the Trial Court

The operative complaint alleges five causes of action and identified Moreno, Merriweather, and Walgreens as defendants.

The first cause of action is against Walgreens only and alleges discrimination based on race and national origin in violation of Government Code section 12940, subdivision (a). The second cause of action is also only against Walgreens and alleges Walgreens failed to prevent discrimination or retaliation in violation of Government Code section 12940, subdivision (k).

The third cause of action is against all defendants and alleges defamation per se. The complaint alleges defendants made statements to persons other than Marvel that

13

Marvel had used the word " 'wetback,' " the persons to whom the information was communicated understood the statements were about Marvel, and defendants failed to use reasonable care to ascertain the truth or falsity of these statements.

The fourth cause of action is against Walgreens only and alleges wrongful termination in violation of public policy.

The fifth cause of action is against all defendants and alleges intentional infliction of emotional distress.

At some point, Marvel dismissed Merriweather as a defendant.

Moreno and Walgreens brought a motion for summary judgment, which the trial court granted.

On the first cause of action, the court found that Walgreens had provided a legitimate nondiscriminatory reason for terminating Marvel, and he had failed to show a triable issue of material fact that the proffered reason was implausible, inconsistent, or baseless. For that same reason, Marvel's second cause of action necessarily failed.

Marvel's third cause of action for defamation failed because plaintiff could not show that Moreno failed to use reasonable care to determine the truth or falsity of the alleged defamatory statements and, as alleged against Walgreens, the trial court found Marvel could not establish that Walgreens acted with malice, which he would need to do in order to overcome a common interest privilege.

As to the fourth and fifth causes of action, the trial court concluded that they failed because they were based on Marvel's discrimination claim.

The court entered judgment in favor of defendants on January 14, 2021. Defendants served notice of entry of the judgment on Marvel and his counsel on February 2, 2021. Marvel served a notice of appeal on March 12, 2021, and filed it on March 15, 2021, making this appeal timely. (Cal. Rules of Court, rule 8.104(1)(B).) In this appeal, Marvel challenges the trial court's rulings regarding the merits of his discrimination and defamations claims, but he does not expressly challenge the trial

14

court's finding that his other causes of action must also fail if his discrimination claim fails.

## I

### *Standard of Review*

A court must grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "[T]hat is," the court must grant the motion if, "there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 844, as modified (July 11, 2001) (*Aguilar*).) In moving for summary judgment, defendants have the burden to show that the cause of action has no merit because an essential element cannot be established or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 850, 861.)

On appeal, we review the record and the determination of the trial court de novo, viewing the evidence in the light most favorable to plaintiffs. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) "We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [].)" (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.)

## II

### *Discrimination Claim*

Marvel alleges that, as a Caucasian and native English speaker and because his national origin is the United States, Walgreens discriminated against him on the basis of race and national origin in violation of the California Fair Employment and Housing Act

15

(FEHA). His theory is that Walgreens discriminated against him when it terminated him for allegedly using the term "wetback," but it did not discipline Moreno for her admitted use of the term.

A.   Analysis of Discrimination Claims on Motions for Summary Judgment

Under FEHA, "[i]t is an unlawful employment practice . . . [¶] [f]or an employer, because of the race, [or] national origin . . . of any person, . . . to discharge the person from employment . . . , or to discriminate against the person . . . in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).)

"In analyzing claims of discrimination under FEHA, California courts have long used the three-stage burden-shifting approach established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [ ] for the analysis of title VII (42 U.S.C. § 2000e et seq.) employment discrimination claims. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 [ ]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [ ] (*Guz*) ['[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes'].) The *McDonnell Douglas* test 'reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' (*Guz*, at p. 354; accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 [ ].)" (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1181 (*Husman*).)

Under the *McDonnell Douglas* test, to state a prima facie case for discrimination under FEHA, "the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such

as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra,* 24 Cal.4th at p. 355; see also *Husman, supra,* 12 Cal.App.5th at p. 1181; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.) "If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises." (*Guz, supra,* 24 Cal.4th at p. 355.)

Once an employee establishes a prima facie case and the presumption of discrimination arises, the employer must offer a legitimate nondiscriminatory reason for the adverse employment action. (*Guz, supra,* 24 Cal.4th at pp. 355-356.) "If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. [Citations.] The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Id.* at p. 356.)

With a motion for summary judgment "[i]n an employment discrimination case, the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of the plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors. (Code Civ. Proc., § 437c, subd. (p); *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 203 [ ].)" (*Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003 (*Hicks*).) "In meeting its initial burden" on a motion for summary judgment "the employer need not rely upon the premise that the plaintiff cannot demonstrate a prima facie case if the employer can set forth admissible evidence of its reasons, unrelated to unlawful discrimination, for the adverse employment action. (*Guz*[*, supra,*] 24 Cal.4th at p. 357.)" (*Hicks, supra,* 160 Cal.App.4th at p. 1003; see also *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 591.)

17

"If the employer meets its initial burden, the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038 [ ].)" (*Serri v. Santa Clara University, supra,* 226 Cal.App.4th at p. 861.) "The plaintiff must do more than raise the inference that the employer's asserted reason is false. '[A] reason cannot be proved to be "a pretext for *discrimination*" unless it is shown both that the reason was false, *and that discrimination was the real reason*.' (*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 515 [ ].) If the plaintiff produces no evidence from which a reasonable fact finder could infer that the employer's true reason was discriminatory, the employer is entitled to summary judgment. (*Caldwell v. Paramount Unified School Dist.*, *supra*, 41 Cal.App.4th at p. 203.)" (*Hicks*, *supra*, 160 Cal.App.4th at p. 1003, italics added.)

B.     Analysis

Walgreens has proffered a legitimate nondiscriminatory reason for its termination of Marvel:  after an investigation into Marvel's reported use of discriminatory language, it concluded that Marvel had used the word "wetback" when speaking with Moreno, an employee of Mexican descent, in violation of Walgreen's employee policies.  In its brief, Walgreens acknowledges that it is Marvel's position that Walgreens's finding that he used the word "wetback" was incorrect.

However, "[i]n demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, ' "[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . ." ' (*Hersant v. Department of Social Services* (1997)

57 Cal.App.4th 997, 1005 [ ].)" (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32 (*Zamora*); see also *Wilkin v. Community Hospital of Monterey Peninsula* (2021) 71 Cal.App.5th 806, 825.) This is so because, "The FEHA does 'not guarantee employees "a stress-free working environment." ' (*Wehunt v. R.W. Page Corp.* (M.D.Ga. 2004) 352 F. Supp. 2d 1342, 1354.) '[The Act] does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "[The FEHA] addresses discrimination." . . . "[It] is not a shield against harsh treatment at the workplace." . . . Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. . . . "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is . . . whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." ' (*Nix v. WLCY Radio/Rahall Communications* (11th Cir. 1984) 738 F.2d 1181, 1187, citations & italics omitted; see [*Guz*], *supra*, 24 Cal.4th at p. 358; *Adamson v. Multi Community Diversified Services* (10th Cir. 2008) 514 F.3d 1136, 1153; *McCollum v. Bolger* (11th Cir. 1986) 794 F.2d 602, 610.)" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344.)

Likely recognizing a decision to terminate an employee based on mistaken perceptions can still serve as a legitimate nondiscriminatory reason for termination, Marvel takes two approaches. First, rather than offer evidence to refute that Moreno and Merriweather believed he used the term "wetback," he tries to convince this court that it ought to give no credence to evidence that supports Walgreens's position that Merriweather, Marvel, and others believed and/or reported to Walgreens management and human resources that Marvel used the word "wetback" when speaking with Moreno.

For example, Marvel tries to convince the court that it was improper for the defendants to include in their separate statement of undisputed material facts any statements regarding Moreno's or Merriweather's perceptions, conclusions, or representations that Marvel used the word "wetback" when speaking to Moreno. He does this by taking the position that whether he used the word "wetback" is "[t]he most basic disputed fact is the essence of the lawsuit," and then he essentially argues that the defendants' evidence that witnesses perceived him as using the word "wetback" cannot be considered to prove he said "wetback."

To support this argument, Marvel cites *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 106 (*Reeves*). Respondent counters that Marvel's attempt to apply *Reeves* to exclude evidence of what witnesses believe Marvel said requires an overly broad reading of *Reeves*, and we agree.

In *Reeves*, the court stated, "*[o]rdinarily* . . . the perceptions of witnesses are simply not 'material facts,' as that term is used in the summary judgment statute. The relevant question is whether the *underlying* facts—the events or conditions witnesses say they perceived—are established without substantial controversy." (*Reeves, supra,* 121 Cal.App.4th at p. 106, first italics added.) While "ordinarily" perceptions may not be material facts, here, what Moreno perceived Marvel as saying, what Merriweather heard Marvel admit on the phone call, and what information was communicated to Walgreens management is material to Walgreens's proffered nondiscriminatory reason for terminating Marvel. Walgreens determined, based on Moreno's and Merriweather's representations—and reports that purported to capture their perceptions—that Marvel referred to Moreno as a "wetback" when speaking with Moreno. That these perceptions may have been incorrect or mistaken does not mean they served as a pretext for discrimination. (*Zamora*, *supra*, 71 Cal.App.5th at p. 32.)

Second, Marvel argues that Walgreens's act of applying the policy to terminate him but not Moreno was, itself, a discriminatory act. Marvel points out that Moreno, in

20

fact, admitted she used the term "wetback" when she confronted him.  He argues Walgreens's disparate treatment of him (a white person born in the United States) and Moreno (a Latina born in Mexico) provides circumstantial evidence that Walgreens discriminated against him based on his race or national origin.

"Showing disparate treatment or policy enforcement is a permissible means" for an aggrieved employee "to establish pretext.  (See, e.g., *McDonnell Douglas Corp. v. Green*, *supra*, 411 U.S. at p. 804 ['Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness to the "stall-in" were nevertheless retained or rehired'].)"  (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 172.)  However, to "establish pretext in this manner," a plaintiff "must identify other similarly situated employees [defendant] did not terminate.  Another employee is similarly situated if, among other things, he or she ' "engaged in the same conduct *without any mitigating or distinguishing circumstances*." ' (*Marquez v. Bridgestone/Firestone, Inc.* (8th Cir. 2004) 353 F.3d 1037, 1038 [ ].)"  (*Wills*, at p. 172, italics added.)

Here there is a distinguishing circumstance between how Marvel allegedly used the word "wetback" and how Moreno used it.  Walgreens's investigation suggested Marvel used the derogatory term without provocation when speaking with an employee of Mexican descent to describe persons within the United States whose national origin is Mexican.  In contrast, parroting Marvel, Moreno used the term, not in a derogatory manner but in an effort to stand up for herself.

Citing that Merriweather (1) referred to the policy's prohibitions on the use of disparaging comments as "zero tolerance" and, (2) identified the policy as applying to "all the employees at the distribution center," Marvel would have this court believe the policy left no room to distinguish between Marvel's alleged use of the term "wetback" and Moreno's admitted use of it.

To support this theory, Marvel cites to *Silver v. KCA, Inc.* (9th Cir. 1978) 586 F.2d 138 (*Silver*). In *Silver*, the plaintiff, along with two coworkers, had confronted a colleague in the coffee room regarding his use of a racial epithet to describe a black [*sic*] employee. (*Id.* at p. 140.) Two days later, the plaintiff's employer terminated her. (*Ibid.*) The plaintiff alleged she was terminated in retaliation for her opposition to her colleague's use of a racial slur, in violation of provisions of the Civil Rights Act of 1964 that prohibit discriminating against employees because they have opposed other actions that violate the Civil Rights Act. (*Ibid.*; see also 42 U.S.C. § 2000e-3(a).) The U.S. Ninth Circuit was asked to consider if an employer's discharge of an employee would be unlawful if the basis for the discharge was the employee's "opposition to a racially discriminatory act of a co-worker rather than to any unlawful employment practice by the employer." (*Silver*, *supra*, 586 F.2d at p. 140.) The court concluded that a discharge of an employee under these circumstances would not be unlawful. (*Ibid.*)

In so finding, the court observed, "not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual. In addition, the means of opposition chosen must be legal . . . and reasonable in view of the employer's interest in maintaining a harmonious and efficient operation . . . ." (*Silver*, *supra*, 586 F.2d at p. 141.)

Marvel reasons that like the plaintiff's behavior in *Silver*, Moreno's confrontation of Marvel when she used the word "wetback" was not a legally sanctioned form of protest that would protect her from termination under laws that protect employees who protest discrimination from retaliatory firings. Thus, he implies, it was unfair for Walgreens to terminate Marvel for allegedly using the word "wetback" while not disciplining Moreno for the admitted use of the word.

That the reasoning in *Silver* may have allowed Walgreens to take a disciplinary action against Moreno without violating the Civil Rights Act does not, in itself,

demonstrate that Moreno's use of the word "wetback" was sufficiently similar to Marvel's use of the word to find he was discriminated against due to his race or national origin. It is not difficult to see why an employer, on the one hand, would find an employee who, unprovoked, used a racial epithet to refer to Mexicans should be subject to zero tolerance discipline, while, on the other hand, an employee who repeated that epithet sarcastically to stand up for herself should not be subject to the same consequences.

III

*Defamation Claims*

### A. <u>Defamation</u> <u>Defined</u> <u>and</u> <u>Elements</u> <u>of a</u> <u>Defamation</u> <u>Cause</u> <u>of</u> <u>Action</u>

"Defamation is effected by" libel or slander. (Civ Code, § 44.) "Libel is a false and unprivileged publication by writing . . . or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) "Slander is a false and unprivileged publication, orally uttered . . . which: [¶] . . . [¶] Tends directly to injure [a person] in respect to his . . . profession . . . either by imputing to him general disqualification in those respects which the . . . occupation peculiarly requires, or by imputing something with reference to his . . . profession . . . that [¶] . . . [¶] by natural consequence, causes actual damage." (Civ. Code, § 46.)

"To prevail on a claim for defamation, plaintiff must show four elements: that defendants published the statements; that the statements were about plaintiff; that they were false; and that defendants failed to use reasonable care to determine the truth or falsity. (CACI No. 1704.)" (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 470 (*Hecimovich*); see also *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 990 (*Grewal*).)

23

B.      Defamation by Moreno

Marvel cannot prevail in his defamation cause of action against Moreno because he cannot show she failed to use reasonable care in determining the truth or falsity of her representation that Marvel called her a "wetback" when she made her complaint or otherwise shared her version of events with coworkers.

In *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 347, the United States Supreme Court held that the states could define for themselves the standard of liability for defamation of private individuals, so long as the states did not impose liability without fault.

Later, our Supreme Court stated that negligence is the standard in California: "We decline to diverge from the near unanimous authority that a private person need prove only negligence (rather than malice) to recover for defamation." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742 (*Brown*); accord, *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 398, ["public figures may prevail in a libel action only if they prove that the defendant's defamatory statements were made with actual malice, i.e., actual knowledge of falsehood or reckless disregard for the truth, whereas private figures need prove only negligence"]; *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 274, ["[T]his court has adopted a negligence standard for private figure plaintiffs seeking compensatory damages in defamation actions"].) As such, California courts require a private person to demonstrate his alleged defamer acted negligently in order to recover on a defamation cause of action. (*Widener v. Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 433 ["Where a *private individual* has been defamed, actual malice need not be shown in order to recover for defamation. Only negligence as to the statement's truth or falsity need be shown when resolving the libel claims of private individuals"]; *Hecimovich*, *supra*, 203 Cal.App.4th at p. 470; *Grewal*,

24

*supra*, 191 Cal.App.4th at p. 990; *Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1015.)

In his deposition, Marvel stated that he "honestly" felt that Moreno thought he said "wetback" when he spoke with her. He acknowledged that the letters "v" and "b" often sound the same.

In her deposition, Moreno stated she gave Marvel the opportunity to clarify what he said during their conversation when she believed he used the word "wetback," and she perceived him as repeating the statement. Moreno's representation that she caused Marvel to repeat the statement in which she believed he had used the word "wetback" before she concluded he said "wetback" is supported by Marvel's deposition testimony, in which he states after he told Moreno in the break room that the worker from C-1 had wanted "a wet vac," she repeated her statement and he repeated his statement regarding a "wet vac."

Plaintiff raises two nonpersuasive arguments in an effort to convince this court that it either should not apply a negligence element to his cause of action for defamation against Moreno, or that it should not find he cannot prove she was negligent in ascertaining the truth or falsity of her representation that he called her a wetback.

First, he notes the trial court's use of *Grewal*, *supra*, 191 Cal.App.4th to identify the elements a plaintiff must prove to succeed in a defamation cause of action. (*Id.* at p. 990.) He argues because *Grewal* was not an employment case, but a case involving a media defendant, the elements it articulates do not apply here. Marvel reasons different standards for media defendants apply due to a need to balance the First Amendment rights of a newspaper against the reputational rights of a defamed party. For purposes of this element, in attempting to distinguish media and non-media defendants, Marvel is setting up a false dichotomy.

Though not directly on point, the First District Court of Appeal's discussion in *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364 (*Nizam-Aldine*), is helpful

25

here.  In *Nizam-Aldine*, *supra*, the court considered whether the holding in *Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 777 (*Hepps*), should apply to nonmedia defendants making statements that involve the public interest.  (*Nizam Aldine*, at pp. 373-374.)  In *Hepps*, *supra*, 475 U.S., the U.S. Supreme Court had held that "[t]o ensure that true speech on matters of public concern is not deterred, we hold that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern."  (*Hepps*, at pp. 776-777.)  It found that placing the burden of proving truth on media defendants in matters of public concern would deter that speech, and "[b]ecause such a 'chilling' effect would be antithetical to the First Amendment's protection of true speech on matters of public concern, we believe that a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant.  To do otherwise could 'only result in a deterrence of speech which the Constitution makes free.' "  (*Id.* at p. 777.)

The *Nizam-Aldine* court rejected a plaintiff's attempt to limit the First Amendment protections articulated in *Hepps* to media defendants.  (*Nizam-Aldine*, *supra*, 47 Cal.App.4th at p. 373.)  The first district explained, "as the Eighth Circuit stated in [*In re* ]*IBP Confidential*[ *Business Documents Litigation* (8th Cir. 1986) 797 F.2d 632], '[t]o recognize the existence of a first amendment right and yet distinguish the level of protection accorded that right based on the type of entity involved would be incompatible with the fundamental first amendment principle that "[t]he inherent worth of speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual." [Citations.]' (*IBP Confidential*, *supra*, 797 F.2d at p. 642.)" (*Nizam-Aldine*, *supra*, 47 Cal.App.4th at p. 374.)  The court continued, "[c]ourts in and out of California have echoed our sentiment, and rejected the distinction between media and nonmedia defendants when addressing related First Amendment issues." (*Ibid.*)  The court concluded, "[i]n sum, the

26

distinction between media and nonmedia defendants which respondents ask us to recognize has been rejected by courts in other jurisdictions and is inconsistent with the First Amendment analyses set forth in several California cases." (*Id.* at p. 375.)

Thus, California courts have recognized that for purposes of protecting First Amendment rights, what must be proven in a defamation case, and which party has the burden to prove it, is based as much on the subject matter of the speech and the identity of the plaintiff as on the identity of the defendant. And California decisions have found that when the subject of an allegedly defamatory statement is a private plaintiff, the plaintiff must show the defendant failed to use reasonable care to determine the truth or falsity of the allegedly defamatory statement. (*Brown*, *supra*, 48 Cal.3d at p. 742; *Hecimovich*, *supra*, 203 Cal.App.4th at pp. 454 & 470 [applying the standard in an action against a parent-teacher organization and volunteers running an afterschool basketball program]; see also *Grewal*, *supra*, 191 Cal.App.4th at p. 990.)

Second, Marvel appears to argue that it is not his burden to prove the falsity of Moreno's representations that he called Moreno a "wetback," but that it is the defense's burden to prove her representations were true. But even assuming Marvel is correct that Moreno would need to prove her statements were true—a position we need not consider here—whether the statements made about Marvel were true or false is not the only inquiry a court makes in considering the merits of a defamation cause of action. To succeed in his defamation cause of action against Moreno, Marvel needed to prevail on *four* elements. (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 470.) *One* of those *four* elements had to do with whether the statements were true or false, but an *additional* element requires him to show Moreno failed to use reasonable care in determining whether the statement was true or not. (*Ibid.*)

Based on this record, Marvel cannot show Moreno failed to use reasonable care in ascertaining the truth of her representations about Marvel. She had a right to say what

27

she thought she heard him say which was reasonable under the circumstances. Marvel's defamation cause of action against Moreno cannot survive summary judgment.

### C. Defamation by Walgreens

In order to qualify as a defamatory statement, the alleged libel or slander must be unprivileged. (Civ. Code, §§ 45 & 46.)

Civil Code section 47, subdivision (c), establishes a qualified privilege that applies to communications made without malice. (See *Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1337 (*Schep*).) " 'This privilege is "recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest." [Citation.]' " (*Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1118-1119 (*Hui*), quoting *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.) " ' "One authority explains the statutory interest as follows: (1) The 'interest' applies to a defendant who 'is protecting his own pecuniary or proprietary interest.' (2) The required 'relation' between the parties to the communication is a contractual, business or similar relationship . . . . (3) The 'request' referred to must have been in the course of a business or professional relationship. [Citation]." [Citation.]' (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914 [ ] [ ].)" (*Hui*, at p. 1119.)

" ' "The defendant has the initial burden of showing the allegedly defamatory statement was made on a privileged occasion, whereupon the burden shifts to the plaintiff to show the defendant made the statement with malice. [Citation.] The existence of the privilege is ordinarily a question of law for the court. [Citation.]" ' (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 108 [ ].)" (*Hui*, *supra*, 222 Cal.App.4th at p. 1119.) In such circumstances, "malice is not inferred from the communication." (Civ. Code, § 48.)

28

A number of cases have now established that communications made during investigations by private employers into sexual harassment or discrimination complaints are privileged. (See *Bierbower v. FHP, Inc.* (1999) 70 Cal.App.4th 1, 3 (*Bierbower*); *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 369 ["complaints to employers about workplace harassment should be [conditionally] privileged. To hold otherwise would have a chilling effect on an employee's right to be free from sexual harassment or discrimination in the workplace by exposing the employee to the risk of litigation as a consequence to seeking enforcement of this right"].) This is so because, "employers and employees both have a common interest in preventing and correcting sexual harassment." (*Bierbower*, at p. 3.) For similar reasons we find, and Marvel appears to concede, that communications made among employees and employers as part of an investigation into allegations of racial discrimination and harassment in the workplace are conditionally privileged. Because the statements at issue here were made during privileged communications, Marvel has the burden of demonstrating that the statements were made with malice. (*Hui*, *supra*, 222 Cal.App.4th at p. 1119.)

"For the purposes of section 47's qualified privilege, 'malice' means that the defendant (1) ' "was motivated by hatred or ill will towards the plaintiff," ' or (2) ' "lacked reasonable grounds for [its] belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." ' (*Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [ ]; see *Taus v. Loftus* (2007) 40 Cal.4th 683, 721 [ ]; § 48a, subd. (d)(4) [defining 'actual malice' as 'hatred or ill will toward the plaintiff'].)" (*Schep*, *supra*, 12 Cal.App.5th at pp. 1337-1338.) "Under principles of respondeat superior, an employer may be held liable for a defamatory statement made by its employee. (See *Sanborn v. Chronicle Pub. Co.*[*, supra,*] 18 Cal.3d [at p.] 411 [ ].)" (*Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 284.)

Marvel presents two theories as to how he can show malice. First, he argues evidence suggests that Moreno reported him because she possessed ill-feelings towards

29

him. Second, he argues the investigation into the truth of Moreno's allegations was so inadequate as to show malice. We find neither argument persuasive and we agree with the trial court that, in light of the evidence presented, Marvel would be unable to prove Walgreens possessed the malice to overcome the common interest privilege.

His first argument misses the point. The question regarding Walgreen's liability for defamation is not whether Moreno acted with malice, but is instead whether Walgreens acted with malice in discussing what the parties thought was and was not said. There is no direct evidence in the record that it did.

Marvel also cannot show based on the evidence presented about the investigation into his alleged misconduct that Walgreens employees "lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard" for his rights. (See *Hui*, *supra*, 222 Cal.App.4th at p. 1121, internal quotations and citations removed.)

In investigating Marvel's statements and making a report to management Merriweather considered an email provided to her which she believed was prepared by the person to whom Moreno made her initial report, in which it was reported that Moreno said Marvel had called her a wetback. Merriweather also considered what she believed to be the English translation of a statement made by Moreno in which Moreno said Marvel called her a wetback. She considered a statement by Willis Leih, in which he said he thought Marvel was talking about a wet vac, but he also said he did not hear the entire conversation between Moreno and Marvel. According to her testimony, she believed during their phone call that she heard Marvel tell her he may have used the word "wetback," and she created a memo memorializing as much. In his deposition, Marvel even testified it was possible Moreno and Merriweather misunderstood him during their respective conversations. Based on this evidence, Merriweather and others had reasonable grounds to believe Marvel called Moreno a wetback. This does not show malice.

Marvel argues that in some cases courts have found a failure to investigate thoroughly and verify facts can support a finding of malice. But the cases Marvel cites for this proposition do not support a conclusion that a jury could find the investigation here was so inadequate that its findings lacked reasonable grounds in reckless disregard of Marvel's rights.

For example, Marvel cites *Rollenhagen v. City of Orange* (1981) 116 Cal.App.3d 414, 424 (*Rollenhagen*), disapproved on other grounds in *Brown, supra*, 48 Cal.3d at page 738, to support his statement that "[c]ourts have found malice where there has been a failure to investigate thoroughly and verify the facts stated." But in *Rollenhagen*, the court—in upholding a judgment non obstante veredicto entered in favor of a defendant— noted, "Plaintiff relies on *Widener v. Pacific Gas & Electric Co.*[, *supra*,] 75 Cal.App.3d 415, and a line of cases cited therein for the proposition that failure to investigate thoroughly and verify facts equates with bad faith or malice." (*Rollenhagen*, at pp. 416, 423-424.) The *Rollenhagen* court demonstrated this characterization of *Widener* was an over-simplification, reasoning, "*Widener* really tells us, however, that *a lack of inquiry and investigation may supply* the sufficient inference of lack of good faith or negligence sufficient to supply the element of malice." (*Rollenhagen*, at p. 423, italics added.) The *Rollenhagen* decision concluded that the *Widener* court "recognized that where the defamatory statement published does not involve an issue of 'hot news' and the need for expeditious release is not present, the element of malice in the form of reckless disregard of whether the statement is true or not may be evidenced *in part* by failure to investigate thoroughly to verify the facts." (*Rollenhagen,* at p. 424.) Thus, the First District Court of Appeal's analysis in response to the plaintiff in *Rollenhagen*'s argument regarding *Widener*— an argument that parallels Marvel's use of *Rollenhagen* here—does not support a finding that a failure to conduct a *thorough* investigation, standing alone, readily supports a finding a malice. Rather, the *Rollenhagen* court actually explained that though *Widener* found (1) a lack of inquiry—i.e., *no* investigation— might show malice,

31

and (2) an investigation that is merely not as thorough as it could be can contribute "*in part*" to a finding of malice, *Widener* did not find that an investigation that is not thorough can, without more, sustain a finding of malice. Marvel's other citations to support his theory that Walgreens's investigation into his conduct was inadequate to a degree that demonstrated malice are equally unpersuasive.

Marvel argues the defamation claim cannot be resolved on summary judgment because the existence or nonexistence of malice is a question of fact for the jury. But "the purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings *in order to determine whether*, despite their allegations, *trial is in fact necessary to resolve their dispute*." (*Aguilar*, *supra*, 25 Cal.4th at p. 843, italics added.) In light of the facts presented on the motion, a jury could not properly find Walgreens was reckless or unreasonable in conducting the investigation as it did. (See *Schep*, *supra*, 12 Cal.App.5th at pp. 1337-1338.) A trial is not needed to resolve this issue.

In an effort to advance his argument that Walgreens's investigation was inadequate to the point that malice can be inferred, Marvel points to various steps he believes Walgreens did not take in performing its investigation. But the ultimate question here is not what Walgreens did not do but whether what it did do suggests malice. Again, we say it did not.

Without tying the argument to a specific cause of action, in his opening brief, Marvel argues that the correct authorities for assessing a case involving an employer's investigation into an employee are *Coltran v. Rollins Hudig Hall International, Inc.* (1998) 17 Cal.4th 93 (*Coltran*) and *Silva v. Lucky Stores* (1998) 65 Cal.App.4th 256 (*Silva*). It seems most likely Marvel's intention was to use these cases to support his argument that he could present sufficient evidence to demonstrate that Walgreens acted in reckless disregard for his rights in conducting its investigation and, therefore, it acted with malice.

These cases are inapposite because they do not involve at will employees. In both cases, the courts considered what type of investigation might be needed to support terminating an employee under an implied agreement not to terminate the employee but for good cause. (*Coltran*, *supra*, 17 Cal.4th at pp. 99 & 107 ["[t]hus, . . . we 'reaffirm our . . . prior rulings . . . that employers are obligated to act in good faith and upon a reasonable belief that good cause for terminating a for-cause employee exists' "]; *Silva*, *supra*, 65 Cal.App.4th at pp. 259 & 277 [concluding the plaintiff who had proceeded on theories sounding in contract had not raised a triable issue of fact regarding whether his employer's decision to terminate him satisfied the standard set forth in *Coltran*].)

IV

*Arguments Regarding Disputed Facts*

Marvel includes at the end of his opening brief a seven-page section under the heading "Summary Judgment for Respondent Walgreen Co. Was Improper Because of Many Disputed Material Facts." But these "disputed facts" do not bear on the central questions of whether defendant could prove he was discriminated against or defamed. As we have discussed herein, they do not. The arguments set forth in this section do not alter our conclusion that the trial court properly granted defendants' motion for summary judgment.

DISPOSITION

We affirm the judgment.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278 (a) (1), (2).)

_____

HULL, Acting P. J.

We concur:

_____

DUARTE, J.

_____

HOCH, J.*

_____

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.